UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 21-cr-132 |
| VERSUS | CHIEF JUDGE HICKS |
| DAVIED MAIDEN | MAGISTRATE JUDGE HORNSBY |

### REPORT AND RECOMMENDATION

**Introduction**

Davied Maiden ("Defendant") is charged with one count of being a prohibited person in possession of a firearm. The charge arises out of an investigatory stop conducted by agents after they witnessed what appeared to be a hand-to-hand transaction at a convenience store located in a high-crime area. Before the court is Defendant's Motion to Suppress (Doc. 22). Defendant argues that all evidence and statements seized as a result of the stop should be suppressed because (1) the stop was not supported by reasonable suspicion and (2) his statements were involuntary. For the reasons that follow, it is recommended that the motion be denied.

**Relevant Facts**

A hearing was held on the motion to suppress. The following facts were established. On January 30, 2021, members of the Shreveport Police Department's Office of Special Investigations were conducting a directed patrol operation throughout the City of Shreveport. Tr. 5, 8. Lt. Scebern Willis, a 27-year veteran of SPD, was driving an unmarked vehicle near the intersection of Hollywood and Jewella. There is a convenience

store called Otto's Gas Station located there. Willis knew that location had problems with narcotics activity, shootings, fights, loitering, and gatherings of large groups. Tr. 8. Over the prior six months, the Shreveport Police Department received approximately 68 calls for service regarding at the address. The calls included numerous reports of "drug activity" as well as "armed person," "shots fired," "loitering/trespassing," "fight," "prowler/suspicious person," and "assault & battery." Govt. Ex. 1. There were other calls for welfare checks, mental health, and the like. Lt. Willis testified that he personally made stops and arrests in the past at the location. Tr. 25. He also testified that other locations in this area, not just this specific address, had similar problems. Tr. 8.

When Lt. Willis passed the store, he noticed a man (later identified as Mr. Priest) leaning up against a car in the parking lot. Around 30 to 45 minutes later, Willis drove by again and noticed the man was still standing in the same place. Willis found this suspicious. At about 1:15 a.m., Willis parked across the street from the store and used binoculars to watch the man. Tr. 9.

After Willis parked, he saw a large dually truck at the gas station near the pumps. Tr. 10. This dually truck was driven by Defendant Davied Maiden and contained a passenger, Mr. Hill, in the right rear seat. Tr. 17, 36, 61.

Lt. Willis saw Priest approach the right rear door of Maiden's truck, and the door opened. Tr. 11. Priest and Hill conversed briefly, and then the passenger Hill handed paper currency to Priest. Tr. 11. Once Priest took the money, he used a cupped hand to hand something to Hill inside the truck. Tr. 11. Hill looked at whatever the item was, then

concealed his hand. Priest walked back to the front of his car, where he continued to lean up against it. Tr. 11, 24.

Lt. Willis had personally seen hand-to-hand narcotics transactions in the past, and he had performed them himself while working undercover. Based on his experience, he believed that he had just observed a hand-to-hand drug transaction. Tr. 12. Willis noted factors that made him believe this. There was the brief nature of the transaction, and the buyer's examination of the item he received after he handed over his money. Willis said that, in his experience, that was the buyer's attempt to verify that he had not been ripped off. Tr. 13-14. Willis testified the transaction could not have been a regular handshake, and while the money possibly could have been a donation, it would not have explained the second part of the transaction in which a small item was handed back after the money was received. When asked whether it could have been a cigarette, Willis said he did not think so, but perhaps it could have been a partial cigarette. Tr. 23. When asked if it could have been an item from the store, Willis said it would have had to be very small, and Priest would have had to have gotten it a lot earlier because he had been hanging out in the parking lot for some time. Tr. 14.

After observing the hand-to-hand transaction, Willis alerted other officers, and they responded in marked police units. Shreveport Police Sergeant John Jackson, a nearly 19-year veteran of the Shreveport Police Department, and DEA Task Force Officer Keith Knox, who was assigned to the narcotics division of Shreveport Police Department in 2004, responded in a marked vehicle. Tr. 29, 32, 54. Jackson did not have his emergency lights activated; he explained that he did not think it was necessary because the vehicles were

already stopped and it was not a traffic stop. Tr. 34. When Jackson arrived on the parking lot, Maiden was sitting in his truck at a gas pump and was not attempting to leave. Tr. 37. Jackson pulled approximately six to eight feet behind Maiden's truck, somewhere between being directly behind it and at an angle. Tr. 35. It is unclear whether the truck was completely blocked in, but it is clear that the officers intended to make contact to further their investigation. Had the truck departed, the officers would have made a traffic stop.

As Sgt. Jackson approached Maiden's truck, he saw the driver, Maiden, reach downward as if reaching for his waistline. Tr. 36. Jackson believed Maiden could be reaching for a weapon. Tr. 36. Jackson opened the driver's side door of the truck, citing concerns for officer safety. Tr. 36-37. As he opened the door, he saw Defendant Maiden holding a handgun, which Maiden then dropped on the floorboard. Tr. 36. The gun lay on the floorboard in plain view. Tr. 38. Sgt. Jackson removed Maiden from the truck and placed him in handcuffs. Tr. 36. Jackson explained that he was detaining Maiden for officer safety to find out what was going on regarding the possible drug deal and Maiden's possession of a weapon. Tr. pg. 39.

Meanwhile, TFO Knox approached Maiden's vehicle on the passenger side. Tr. 58. As he approached, he could see Hill, the back seat passenger, making movements, looking further back, and raising up in his chair as if he was trying to conceal something in his pants or waistband. Tr. 58. Knox then heard Sgt. Jackson giving loud verbal commands, which led him to believe there was an "imminent situation" and that the driver was armed. Tr. 58. Knox then opened the back passenger door to see what the rear passenger was doing and to get a line of sight to Jackson. Tr. 58. Knox removed Hill from the vehicle

and conducted a pat down, which resulted in the discovery of a crack pipe. Tr. 61-62. Baggies of crack cocaine were recovered from Priest's car. Tr. pg. 69. No drugs were found on Hill or in Maiden's truck.

Once Maiden was in handcuffs, Sgt. Jackson advised him of his <u>Miranda</u> rights. Tr. 39. DEA Task Force Officer Coleman, who was also part of the patrolling operation, was contacted and arrived on the scene. Tr. 66. Coleman was briefed on the situation by another officer. Tr. 66. Coleman then asked Defendant Maiden questions, which were recorded. Gov. Ex. 2 (audio recording). TFO Coleman began by asking if Maiden was a felon. <u>Id</u>. After Maiden answered yes, Coleman asked a follow-up question about the felony. Coleman then asked if Maiden had been read his rights. Maiden claimed he had not, so Coleman provided <u>Miranda</u> rights to Maiden. Tr. pg. 67. Maiden agreed to speak to TFO Coleman and was questioned for approximately six minutes.

**Law and Analysis**

    **A. Reasonable Suspicion**

"The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968)." <u>United States v. Rosales-Giron</u>, 592 Fed. Appx. 246, 250 (5th Cir. 2014); quoting <u>United States v. Stevens</u>, 487 F.3d 232, 244 (5th Cir. 2007). "Under <u>Terry</u>, we determine the reasonableness of an investigative stop by examining: (1) whether the officer's action of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." <u>Id</u>.

For a traffic stop to be justified at its inception, an officer need only have reasonable suspicion that "some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." United States v. Lopez-Moreno, 420 F.3d 420, 430 (5th Cir. 2005). In making a reasonable suspicion inquiry, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002); United States v. Cortez, 449 U.S. 411, 417 (1981). Reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. See, e.g., United States v. Santiago, 310 F.3d 336, 340 (5th Cir. 2002). In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other. Arvizu, 534 U.S. at 274. However, the officer's mere hunch will not suffice. Terry, 392 U.S. at 27. Reasonable suspicion need not rise to the level of probable cause. Arvizu, 534 U.S. at 274.

The parties dispute at what point the agents' interactions with Maiden and Hill became a detention under the Fourth Amendment. Maiden argues that he was seized when the agents parked their car behind them, thereby preventing their departure. The Government argues that the detention did not occur until Jackson opened the driver's door of the truck.

The court need not resolve that dispute because, under either scenario, there was ample reasonable suspicion to justify the agents' actions. At the time the police car parked behind Maiden's truck, reasonable suspicion existed based on Willis observing Maiden's

passenger, Hill, exchange paper currency for a small item in what appeared to be a hand-to-hand drug transaction, their presence in a very high-crime location at 1:30 a.m., and the furtive movements of Maiden and Hill as the agents approached. United States v. Flowers, 6 F.4th 651, 654-56 (5th Cir. 2021) (reasonable suspicion where experienced officer observed two men in a car parked in a suspicious manner at a convenience store in a high crime area); United States v. Guzman, 2013 WL 4097433, at *5 (W.D. Tex. Aug. 13, 2013), aff'd No. 13-51187 (5th Cir. 2015) (denying motion to suppress and noting that "an experienced police officer's observation of a hand-to-hand exchange or transaction supports a finding of probable cause.").

This case is distinguishable from cases where the only factor regarding reasonable suspicion was the fact that two men were talking and shaking hands in a high crime area and the agent did not see anything exchanged between the two. To the contrary, the agent saw Priest standing near his car in an area well known to be a high crime area at around 1:00 a.m., and Priest remained in that same place about 30 minutes later when the agent returned. Priest then approached Hill, and the agent saw Hill hand cash to Priest, who provided Hill with a small item in exchange. Hill cupped the item in his hand as if to conceal it, but then looked down at the object as if to confirm that he had not been ripped off. (The agents testified that it is normal for buyers to confirm their purchase because sellers will sometimes substitute other items, such as crushed drywall, in lieu of illegal drugs.) Priest then quickly returned to his prior location next to his car. This is a classic case of an experienced officer witnessing an open and obvious hand-to-hand drug transaction and recognizing it as such.

That the transaction took place in high crime area adds to the basis for finding reasonable suspicion for a detention. Agents Willis, Jackson, Knox, and Coleman testified that 3665 Hollywood Avenue is known to them for crime. Tr. 8, 32-33, 54-55, 65. The officers referenced crimes which included narcotics activity, weapons violations, shootings, and fights. Tr. 8, 33, 55, 65. The agents testified that they had personally been involved in investigations involving that address. Tr. 25, 49, 54-55, 65. Willis recalled personally making stops and arrests at that location. Tr. 25. Jackson had been present at the location when individuals were arrested for narcotics violations. Tr. 49-50. Knox has been involved in investigations at that address ranging from illegal possession of weapons to narcotics violations and armed robberies. Tr. 55. Coleman testified that, only a month prior to the incident involving Maiden, he was involved in an investigation that started at 3655 Hollywood Avenue and resulted in the recovery of two firearms after a high-speed car chase. Tr. 65. The agents' testimony is corroborated by Gov. Ex. 1, a list of approximately 68 calls for service received by the Shreveport Police Department for the specific address of 3655 Hollywood Ave. Some of the calls were for very serious criminal activity involving guns and shots fired.

The agents also justify their actions based on safety concerns. Under Terry, legitimate officer safety concerns can reasonably outweigh personal liberty interests during street encounters, justifying limited searches for weapons without probable cause. Terry acknowledged the legitimacy of a policeman's interest in taking steps to assure himself that a person with whom he is dealing is not armed and dangerous, and it emphasized this

Page 8 of 10

concern by citing the increasing number of murders and assaults being perpetrated on law enforcement officers. Terry, 392 U.S. at 23, n. 21. (That concern is especially heightened today.) An officer need not be certain that an individual is armed; the issue is whether a reasonably prudent man could believe, based on "specific and articulable facts," that his safety or that of others is in danger. Id. at 27. In assessing reasonableness, "due weight" must be given to the facts and inferences viewed "in light of [the officer's] experience." Id.

When the agents parked behind Maiden's truck and approached the driver and passenger, they witnessed Maiden make furtive movements consistent with reaching for a weapon. They also saw Hill (in the back seat) make movements consistent with hiding something (or reaching for something) in his pants or waistband. These movements alarmed the officers about their own safety and the safety of others around them and led to an even greater level of reasonable suspicion. That reasonable suspicion justified the officers opening the truck's doors to check for weapons. United States v. Jerry, 2019 WL 3228847 (W.D. La. 2019)(Hornsby, MJ). Their suspicions were confirmed when Sgt. Jackson opened the driver's door and saw Maiden holding a handgun.

### B. Defendant's Statements

Maiden argues that his statements should be suppressed because they are tainted by the illegal search and seizure. That argument fails for the reasons stated above. Furthermore, Maiden was given Miranda warnings at the scene. Tr. 39. And when he erroneously claimed he was not given Miranda warnings, the warnings were provided a second time. Tr. 67. Accordingly, Maiden's argument regarding his statements lack merit.

**Conclusion**

The agents had ample reasonable suspicion to conduct an investigatory detention of Maiden. That reasonable suspicion increased as agents approached Maiden and his passenger, Hill, to investigate further. During that investigation, the firearm was found in plain view. The searches and seizures at issue were lawful, the interviews of Maiden were conducted post-<u>Miranda</u>, and Maiden's statements were voluntarily made.

Accordingly,

It is recommended that Maiden's Motion to Suppress (Doc. 22) be denied.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Crim. P. 45(b). A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See <u>Douglass v. U.S.A.A.</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 7th day of March, 2022.

Mark L. Hornsby
U.S. Magistrate Judge